FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

01 AUG 17 AM 9:22

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| THOMAS KIRKLAND and KENNETH BECK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV 00-BU-3365-M |
| | ) | |
| HOUGH INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

AUG 17 2001

## Memorandum Opinion

In their complaint in the above-styled action, Plaintiffs Thomas Kirkland and Kenneth Beck bring claims against their former employer, Defendant Hough International, Inc. ("Hough"), alleging failure to pay overtime and unlawful retaliation, in violation of the Fair Labor Standards Act ("FLSA" or "Act"), 29 U.S.C. § 201 et seq. Plaintiffs also bring state law claims against Hough for fraudulent misrepresentation, fraudulent suppression, and breach of contract. Now before the Court is Hough's motion for summary judgment, filed June 4, 2001 (Doc. 10). The parties have filed evidence and briefs in support of their respective positions on the motion, which is now ripe for decision. Upon careful consideration of the record and the arguments of counsel, the Court concludes that Hough's motion for summary judgment is due to be GRANTED IN PART AND

16

DENIED IN PART.

## I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that

'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " <u>Reeves v. Sanderson Plumbing Products, Inc.,</u> 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299).

## II. BACKGROUND[1]

### A. Hough International, Inc.

With its principal place of business located in Albertville, Alabama, Hough is a company involved in designing, building, and equipping animal feed mills in the United States and abroad. Hough's company president is Peter Karamanolis ("Peter"), who is primarily involved in the overall management of the company in terms of acquiring business and budgeting contacts. Peter's younger brother, George Karamanolis ("George"), is Hough's operations manager. Second to Peter in Hough's chain of command, George is the person to whom most company supervisors report. A still younger Karamanolis brother, James ("James"), was the company office manager.

### B. Kenneth Beck

Hough first hired Beck in 1989 to work as an hourly employee painting feed mill equipment at its Albertville facility. A couple of months later, Beck was given the title "lead painter," although he was the only painting employee for a period of time. In July 1994, Beck was put on salary when he was promoted to a "working supervisor" position, in which he assisted and supervised from between one to four

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. <u>See</u> <u>Cox v. Administrator U.S. Steel & Carnegie</u>, 17 F.3d 1386, 1400 (11th Cir. 1994)." <u>Underwood v. Life Ins. Co. of Georgia</u>, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

hourly employees in painting mill equipment and then crating it for shipment.  If work was slow in the Albertville plant, Beck and the employees he supervised would also help in the manufacturing area or even cutting the grass.  However, Beck kept his same salary even when performing such work.

About the first of December 1997, George asked Beck to take a painter under his supervision, Tim Bearden, to go build concrete forms for three days on a feed mill construction project that Hough was performing for the Charoen Pakphand Company near Eufaula, Alabama, about 250 miles away.  Hereinafter, the Court will refer to this project as the "CP project."  Beck and Bearden assented to go. Soon after they arrived, the project superintendent learned that Beck had some knowledge of construction work, and he asked Beck and Bearden to stay on the project longer.  They agreed to do so, with Beck eventually remaining on the project full-time until August 1998.  Bearden stayed a much shorter period, only 17 days.  During the time that Beck was on the CP project, his weekly salary increased from $605 to $630.

When Beck first arrived on the site he was, he states, "a worker just like everybody else down there."  Hough had subcontracted out much of the work on the CP project, so when Beck and Bearden arrived, they, along with George and the project superintendent, were the only Hough employees on the site.  Beck continued to act as Bearden's supervisor, but whereas Beck did more overseeing of and directing Bearden's work when they were at the Albertville facility, on the CP project, Beck himself did the same kinds and amounts of physical labor that Bearden did.  It is undisputed that Beck did this type of physical labor for at least the first week or week-and-a-half he was on the CP project, but perhaps longer.

George also hired a crew of three men from the local area to help Beck do any tasks that generally needed to be done to help keep the project on schedule, be it building and setting concrete forms, tying rebar steel, digging ditches, welding, or helping to install equipment.  Beck admits that he would "make sure" that this crew of hourly employees "stayed on course," although he claims that he worked alongside them and that George both kept a close watch over the group, provided most of its direction, and held disciplinary authority.

Beck reported to the project superintendent, who would give Beck and the crew with whom he worked deadlines for tasks to be complete so that concrete could be poured in particular areas.  However, it appears that near the end of December 1997, the project superintendent quit, and George assumed his responsibilities.  From the time Beck came to the site in December 1997 until about June or July 1998, George was at the site almost every day.  Thus, Beck reported to George for most of the time that he was on the CP project, arriving early at the site each morning and receiving verbal instructions from George as to what work he and the crew needed to do that day.  Further, during the workdays George was there, Beck alleges, he watched Beck and his employees almost "all of the time."

Beginning in about June or July 1998, however, George would leave the CP project site for one to two weeks at a stretch.  Beck admits that during these periods he was in complete charge of the local men Hough hired to help him and that he made decisions, usually reserved to George, with respect to what supplies had to be purchased at the hardware store.  In fact, Beck acknowledges that during George's absence he was "in charge" of the project for Hough, at least in the sense that he

was the highest ranking company representative at the site on an everyday basis[2] and that it was he who George would call from the office to get progress reports. Beck expressly denies, however, that he ever did "oversee" or direct the work of the subcontractors or their employees. In fact, Beck asserts that he was not advised of the schedules the subcontractors had to meet and that it was George, not he, who critiqued all of the subcontractors' work when George would return to the project site. Beck suggests that he was, rather, merely a liaison between George at the office and the subcontractors working on the site, relaying messages regarding problems the subcontractors were encountering and instructions from George.

According to Beck, during the first week he was on the CP project, he worked 72 hours. Soon thereafter, he approached George at the end of the workday and inquired about being paid for the 32 hours of overtime he had thus far worked. George allegedly relayed to Beck in confidence that Hough was "in the red" and that the project was behind schedule, and he asked Beck if he wanted his pay for overtime on a weekly basis or whether he preferred to get it at the end of the job in "one big check." Beck told George that he wanted the latter.[3]  Thereafter,

---

[2]There were times in July and August 1998 that additional Hough supervisors and their subordinates would drive down to the site from Albertville to assist in the installation and setup of equipment. However, Beck claims that he did not have authority to direct the work of any of these employees.

[3]George denies that he ever told Beck that he would receive <u>overtime</u> for the work he did on the CP project. He recalls with regard to the conversation in question that Beck said he wanted to receive his <u>reimbursement</u> for expenses, such as mileage and a per diem allowance, in a lump sum. Bearden, however, stated in his deposition that he was present for the conversation between Beck and George, and that the subject they discussed was overtime pay. Bearden also confirms that Beck told George that he wanted such pay all at once at the end of the job. Of course, even without such corroboration from Bearden, the Court must, for purposes of Hough's motion, credit Beck's testimony over George's.

Beck allegedly worked between 72 and 84 hours each week on the CP project, until he returned to his regular post at Hough's Albertville plant in August 1998.[4]

Shortly after Beck first returned to Albertville, he had received a check from Hough representing an amount for his total per diem allowance and reimbursing him for a number of expenditures he had made during his tenure on the CP project. However, Beck did not receive any overtime pay, so he asked George when he would receive it. George allegedly told him to get back with him in a couple of weeks. Beck did so, but George similarly put him off. George also allegedly suggested to Beck at that time that the holdup related to financial difficulties within the company, although George implied that money would become available soon based on the progress of other jobs Hough had going in a number of locations.[5]

Subsequently, a Hough supervisor asked Beck if he would go out and work on another feed mill construction project the company had in Chattanooga, Tennessee (the "Chattanooga project"). Beck declined, stating that the issue of his overtime pay for the work he had done on the CP project had not been resolved and that he was not going back out into the field until it was. Beck responded likewise to a number of similar requests later made by Hough supervisors asking for him to travel to various worksite locations.

For example, in about August or September, 1999, Vic Allen, the assistant plant manager in Albertville, asked Beck and another working supervisor to go work on a Hough project in Pennsylvania (the "Pennsylvania project") and to take

---

[4]Beck explained that although he went back to Albertville in August 1998, he returned to the Eufaula site a couple of different times in September 1998 to help work on equipment that was not functioning properly.

[5]George denies that either of these conversations took place.

four other men with them. Beck again repeated that he still had not been paid his overtime for the CP project and that he was not going anywhere until he was. Allen soon came back to Beck on a Thursday or Friday and told him that there was going to be a meeting the following Monday to resolve the overtime issue because the company needed Beck to carry those men and do the job in Pennsylvania. However, when Monday arrived, Allen advised Beck that there would be no meeting and that James Karamanolis had said that Beck would have to handle any problem he had with George alone.

Peter Karamanolis later approached Beck and again asked him to go to the Pennsylvania project. But Beck remained steadfast, stating that he would not go until he was paid for the overtime he believed he was owed. Peter then allegedly "belittled" Beck in front of a number of hourly employees working in the shop, telling them that he, Peter, would have allowed them to work 50 hours per week to obtain overtime pay in Pennsylvania, but that Beck and the other supervisor asked to go would only receive a per diem allowance like everyone else because they were on salary. Peter also told these hourly employees that it looked like they would not be getting this overtime pay because Beck would not agree to go work on the project.[6]

Thereafter, Peter asked Beck to carry some pieces of equipment and two men to the project site in Chattanooga and stay until the project was completed. Again Beck said he was not going to go until the he was paid overtime for the CP project. Peter responded that he felt that they had been good to Beck and that he was not going to be compensated for overtime work on the CP project. Beck states that

---

[6]Peter denies that this conversation occurred.

Peter then said to him that if he was "not going to do them any more favors," they did not need his employment any longer, and he asked Beck to turn in his keys to the Albertville facility.[7]  At that point, Beck considered himself terminated.

### C.  Thomas Kirkland

Kirkland was employed by Hough several times between 1992 and 1997 as an hourly maintenance worker.  When he returned to work for Hough in 1997, Kirkland was a maintenance foreman at the Albertville facility making $13.00 per hour with occasional overtime, paid at a time-and-a-half rate.  His duties included upkeep of the building and equipment, testing of equipment, and supervision of two full-time employees.

In about February 1999, Kirkland resigned to take a job with another company.  But in about October 1999, a Hough supervisor contacted Kirkland and asked him to attend a meeting with George to discuss coming back to work for Hough.  At that meeting, George re-hired Kirkland to work at the Albertville facility on a salary basis at $620 per week, with no overtime pay for work he did in the shop.  George also told Kirkland, however, that he would be needed to work "out in the field" on various projects and that he would be paid for overtime on such projects, either by having his salary raised or by being paid on an hourly basis.  Kirkland further suggests that George told him at that time that if he went into the field, Hough would pay for his accommodations, plus a per diem allowance.

Kirkland performed maintenance duties at the Albertville facility until about November 29, 1999, when he started working on the Chattanooga project.  On December 1, 1999, Kirkland drove his truck from his home in Albertville to the

---

[7]Peter also denies that this exchange took place.

Chattanooga project site.  There he was met by George, who told Kirkland that he was going to be needed there until at least Christmas, so he should bring a sleeping bag from home.  Upon hearing George say this, a Hough supervisor, Wayne Franks, asked George where Kirkland was going to sleep.  George replied that he would sleep in one of two campers that Hough had near the site.  Franks advised that they were already full and that there was no room for Kirkland.  George then said to Kirkland, "Well, you can bring your camper up, Thomas."  Kirkland agreed to do so.  However, at that time, Kirkland's motorhome was not road ready, so for about the first two weeks he worked on the Chattanooga project, Kirkland commuted between his Albertville home and the jobsite.  After that, he stayed each night in his motorhome, which he had brought to the site, until he completed his work on the project on about April 23, 2000.  Although Kirkland was given a $150 weekly allowance in addition to his normal weekly salary of $620, Hough did not reimburse him for mileage or any expenses in connection with the use of his motorhome in Chattanooga.

Kirkland claims that during his time on the Chattanooga project, he worked approximately 60 hours per week as a "field technician."  Kirkland's job responsibilities involved making sure that equipment was installed and working properly in anticipation of starting up production at the mill.  Kirkland claims that in doing such tasks he worked alone and did not supervise anyone.  He did, however, attend daily meetings that included only supervisory personnel, at which time the status of the project was discussed, and George provided instructions regarding what items had to be completed to stay on schedule.  Once production at the mill was initiated in approximately March 2000, Kirkland helped train the

employees of Cook Foods, the company that would be running the mill, on how to operate and maintain the equipment. Also during this same period, there would be times where feed or chemicals would spill or leak from malfunctioning equipment, and the feed or chemicals would have to be cleaned up before Kirkland could access the equipment to do the technical work required to fix it. On these occasions, Kirkland explained, he had authority to direct a crew of two or three laborers employed by Hough to perform the clean-up work.

Kirkland left the Chattanooga project in April 2000 and returned to work at the Albertville facility. There he continued to receive the same salary of $620 per week. Several weeks later, around May 8th or 9th, George told Kirkland that he needed Kirkland to go work on another feed mill construction project in Rockmart, Georgia (the "Rockmart project"). At the Rockmart project, Kirkland was assigned the responsibility of doing the plumbing work on the air lines and liquid lines. At times, he ordered some of the parts required for these duties, and he had two employees working under his direction. As in Chattanooga, Kirkland also attended daily supervisor status meetings, which were conducted by George and the project superintendent.

Upon arriving at the Rockmart project site, Kirkland spoke with George about the overtime pay Kirkland believed he was owed for the Chattanooga project. George replied that Kirkland was going to work in Rockmart for about two weeks and then he was needed to work on a project in Australia and that he would "make the adjustment" on Kirkland's pay once he came back from Australia. George also allegedly added that Kirkland would receive a "bonus" for the work he

had done in Chattanooga regardless of whether he went to Australia.[8]  Kirkland states that while he was working on the top of the building within the first week he was on the Rockmart project, George called him to the side and told him that he would also receive a "bonus" if he would "stay until we finish the pipe" and that he would get paid for overtime he worked.[9]

Kirkland worked on the Rockmart project for about four months between May and September 2000. Kirkland states that his "understanding" at the Rockmart project was that Hough would give its employees a "suitable" place to live and a $150 weekly allowance in addition to any regular compensation. Kirkland received the allowance, but he claims that the camper in a trailer park Hough provided for him and another man to sleep in was unliveable because it smelled of raw sewage. Kirkland asked George if he would pay for a hotel room, but George refused. Therefore, Kirkland commuted between his home and the Rockmart jobsite, which was about 86 miles one way, every Monday through Friday.[10]  Kirkland claims that he worked at Rockmart from 7:30 a.m. to about 6:00 or 6:30 p.m. each day, five days per week.

However, instead of driving his truck directly home on Friday evenings,

---

[8]George denies promising to pay Kirkland a "bonus" for work performed in Chattanooga.

[9]George acknowledges that he said he would pay Kirkland a $2,000 bonus if Kirkland stayed to finish the plumbing work at Rockmart. However, he states that Kirkland quit before completing such work, so he was not paid the bonus.

[10]Hough did not pay Kirkland mileage for the daily commutes he made between his home and Rockmart. However, Kirkland concedes that he did not submit any requests for such mileage, based upon George's representation that he would be paid overtime and a bonus. In contrast, Kirkland did submit requests and was paid mileage for any extra amounts he drove between Rockmart and Chattanooga relating to the weekend warranty repair work he performed at the latter location.

Kirkland would often go first to the Albertville facility and pick up supplies and equipment. He would then transport these to Chattanooga, where he would spend the weekend and sometimes the following Monday fixing breakdowns that occurred at the Chattanooga mill, which was still under warranty. Thus, on regular occasions during this period Kirkland traveled between Albertville, Rockmart, and Chattanooga, and on these trips he used his truck to haul equipment, such as welding machines, pipe threaders, and extra sheet metal, to be used at the various project sites.

During the last week that Kirkland worked at Rockmart, he asked that he be able to take that Wednesday and Thursday off, in order to work on a sewer line at his residence. Peter granted that request. On Friday morning, Kirkland reported to work at Rockmart, where he received his paycheck at noon. However, in addition to his paycheck, Kirkland was expecting to receive an expense check for about $170, reimbursing him for gasoline and diesel fuel he had allegedly purchased the week before in connection with pulling a Hough trailer and equipment to the Chattanooga jobsite. When he received only his regular paycheck, Kirkland immediately left Rockmart and drove to the Albertville facility to speak with Peter about the failure to reimburse him. However, Peter was not in his office, and Kirkland went home without speaking to anyone.

The following Monday, Kirkland still did not report to work, and George called him at home and asked him where he was. Kirkland indicated that he was not going to come back to work until he was reimbursed for the fuel relating to the Chattanooga trip and paid the overtime he believed he was owed. George offered to give him one extra day's pay, but Kirkland replied that was not good enough.

At that time, George asked Kirkland to turn in all of his tools. Kirkland never again worked for Hough. Later, Kirkland picked up his final paycheck, which showed that he had been "docked" two days pay for the Tuesday and Wednesday that Peter had allowed him to have off to work on his sewer line.

### D. The Lawsuit

On October 25, 2000, Kirkland and Beck filed this action against Hough in Alabama state court. In Count I of their complaint, Plaintiffs assert that Hough violated the FLSA by failing to pay them overtime. In Count II, Plaintiffs claim that Hough is liable for retaliatory discharge under the FLSA, based on allegations that Beck was fired and Kirkland was constructively discharged for having complained about Hough's failure to pay them overtime. In Count III, Plaintiffs claim that Hough is liable for fraud and suppression under Alabama state law. More specifically, Plaintiffs maintain that Hough personnel falsely represented to them that they would be reimbursed for out-of-pocket expenses, mileage, and overtime they worked. Kirkland also claims he was falsely told that he would be reimbursed $20 per day for the use of his personal motor home as lodging. Plaintiffs contend that they relied to their detriment upon these representations by continuing their employment and continuing to work on out-of-town jobsites. And finally, in Count IV, Plaintiffs assert state-law claims for breach of contract, based on allegations that Hough failed to reimburse them amounts promised for mileage and other expenses incurred in connection with traveling.

On November 21, 2000, Hough removed the case to this Court, pursuant to 28 U.S.C. §§ 1441 and 1446. The Court has subject matter jurisdiction over the FLSA claims pursuant to 28 U.S.C. § 1331. See Brown v. Sasser, 128 F.Supp. 2d

1345, 1347 (M.D. Ala. 2000); <u>Roseman v. Best Buy Co., Inc.</u>, 140 F.Supp. 2d 1332, 1334 (S.D. Ga. 2001). The Court exercises supplemental jurisdiction over the state-law fraud and contract claims pursuant to 28 U.S.C. § 1367(a). On June 4, 2001, following the completion of discovery, Hough filed the instant motion for summary judgment on all claims.

## III. DISCUSSION

### A. FLSA Claims for Overtime

The FLSA requires, <u>inter alia</u>, employers to pay covered employees additional compensation for overtime work. In particular, § 7(a)(1) of the Act prohibits employers from employing covered employees "for a workweek longer than forty hours" unless such employee is compensated for any time in excess thereof "at a rate not less than one and one-half times [his] regular rate" of pay. 29 U.S.C. § 207(a)(1). Section 16(b) of the Act authorizes private causes of action against employers for violations of the Act, stating in pertinent part as follows: "Any employer who violates the provisions of . . . section 207 [the overtime wage provisions] . . . shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

Each Plaintiff brings a claim alleging that he is entitled to overtime compensation under the FLSA. Specifically, Beck claims that he is owed overtime for the hours he worked over 40 per week when he was working on the CP project, while Kirkland similarly claims he is owed overtime for the hours he worked over 40 per week on the Chattanooga and Rockmart projects. While Hough acknowledges that it did not pay either Plaintiff overtime for the aforementioned

periods, it denies that it violated the FLSA by failing to do so. In particular, Hough asserts (1) that Kirkland meets the motor carrier exemption of § 13(b)(1) of the Act, (2) that each Plaintiff meets the executive exemption of § 13(a)(1) of the Act; and (3) that Beck's claim is barred by the statute of limitations. The Court now turns to these arguments.

### 1. The Motor Carrier Exemption

Hough contends that Kirkland is exempt from the overtime compensation requirements of the FLSA based upon § 13(b)(1) of the Act, which specifies that the overtime provisions of the Act shall not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). Section 31502(b) of Title 49, part of the Motor Carrier Act ("MCA"), gives the Secretary of Transportation the power to establish maximum hours of service and qualifications for employees of a "motor private carrier, when needed to promote safety of operation." The definition of "private motor carrier" includes a corporation that is not a "motor carrier"[11] and that (1) transports property by motor vehicle in interstate commerce; (2) is the "owner, lessee, or bailee of the property being transported"; and (3) transports the property "to further a commercial enterprise." 49 U.S.C. § 13102(13). See also Herman v. Suwannee Swifty Stores, Inc., 19 F.Supp.2d 1365, 1372 (M.D. Ga. 1998); Sinclair v. Beacon Gasoline Co., 447 F.Supp. 5, 10 (W.D. La. 1976), aff'd "for the reasons set forth in the carefully prepared opinion" of the district court, 571 F.2d 978 (5th Cir.

---

[11]A "motor carrier" is a person or corporation "providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12). It is undisputed that Hough is not a "motor carrier."

1978)[12]; <u>Friedrich v. U.S. Computer Serv.</u>, 974 F.2d 409, 412 (3ʳᵈ Cir. 1992).   In order to come within the ambit of the Secretary of Transportation's regulatory power under the MCA, a motor private carrier employee must engage in activities of a character directly affecting the "safety of operation" of motor vehicles transporting property in interstate commerce. <u>Troutt v. Stavola Bros., Inc.</u>, 107 F.3d 1104, 1107 (4ᵗʰ Cir. 1997); <u>Friedrich</u>, 974 F.2d at 417. See also 29 C.F.R. § 782.2; <u>Spires v. Ben Hill County</u>, 980 F.2d 683, 686 (11ᵗʰ Cir. 1993); <u>Baez v. Wells Fargo Armored Service Corp.</u>, 938 F.2d 180, 182 (11ᵗʰ Cir. 1991).

"The Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the Motor Carrier Act are mutually exclusive and there are no overlapping areas of jurisdiction." <u>Spires v. Ben Hill County</u>, 980 F.2d 683, 686 (11ᵗʰ Cir. 1993) (citing <u>Morris v. McComb</u>, 332 U.S. 422, 437 (1947)). "To avoid any conflict between these Acts, Congress determined that the Secretary of Transportation need not actually exercise his power to regulate under the Motor Carrier Act; an exemption under section 13(b)(1) is created so long as the Secretary has the authority to regulate over a particular category of employees." <u>Id.</u>  Therefore, if the Secretary of Transportation had the power to regulate Kirkland's qualifications and maximum hours under § 31502, then Kirkland is necessarily exempt from the overtime provisions of the FLSA, regardless of whether the Secretary undertook to exercise such power.

Hough maintains that Kirkland meets the motor carrier exemption based upon his testimony that each week during the period he was working on the

---

[12]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11ᵗʰ Cir. 1981) (en banc).

Rockmart project, he drove his truck between Rockmart, Albertville, and Chattanooga while transporting property belonging to Hough to be used on the projects, such as extra sheet metal, a pipe threader, and welding equipment. The Court agrees. Kirkland indicated that, while stationed at Rockmart, he regularly drove a motor vehicle, i.e., his truck, substantial distances between two or three states. On those trips, he carried with him welding supplies and other equipment that constitute "property" within the meaning of the MCA. See Friedrich, 974 F.2d 417-18 (field engineers servicing computer hardware who routinely transported tools, parts, and equipment to customer sites in several states using their lightweight personal vehicles were subject to the motor-carrier exemption); Sinclair, 447 F.Supp. at 10-11 (field employees carrying tools and equipment in company-owned trucks across state lines to maintain and repair a natural-gas pipeline were exempted from the FLSA overtime provision); Turk v. Buffets, Inc., 940 F.Supp. 1255, 1261-62 (N.D. Ill. 1996) (restaurant equipment service technicians were subject to the motor carrier exemption based upon their interstate transportation of tool kits and repair equipment); Harshman v. Well Service, Inc., 248 F.Supp. 953 (W.D. Pa. 1964) (plaintiffs who drove and performed maintenance on pump trucks that carried special equipment for cementing gas wells located in several states were subject to the motor-carrier exemption), aff'd, 355 F.2d 206 (3rd Cir. 1965). Such property was owned by Hough and was transported to "further a commercial enterprise," namely for use on the various mill construction projects. The Court concludes that all the elements of the motor carrier exemption are met here.

Kirkland does not seriously dispute that his case would appear to satisfy the literal requirements of the motor carrier exemption. Nonetheless, he urges that he

does not meet the exemption for several reasons. First, he argues that the primary purposes of his trips was to commute from his home to the construction sites, so the transportation of the tools and supplies was incidental. Initially, the Court would note that the record does not bear out Kirkland's assertion that his transportation of supplies and equipment was entirely incidental. It certainly appears that transportation of property may not have been the primary reason for any particular trip Kirkland took between Rockmart, Albertville, and Chattanooga. However, Kirkland acknowledged that he would make trips to the Albertville facility for the specific purpose of picking up supplies and equipment for use on one project after leaving the other, demonstrating the importance of bringing with him the property in question.

But even if it might be said that the transportation of equipment was merely "incidental," the only authority Kirkland cites in support of the proposition that such puts him outside the MCA exemption is the dissent in Friedrich. Therein Chief Judge Sloviter opined that the majority in that case had been overly literal in its interpretation of the MCA exemption and had thereby created an anomalous result that would encourage employers to attempt to circumvent the overtime requirements of the FLSA by requiring their employees traveling in lightweight vehicles to carry small amounts of equipment or spare parts. See 974 F.2d at 420-22. While not wholly unsympathetic to some of the concerns expressed in that dissent, the Court ultimately finds itself in agreement with the district court in Turk, which responded thus when faced with the very argument Kirkland now poses:

> Neither the statute nor authoritative interpretation qualifies the
> transported property in terms of whether it is incidental or necessary
> to the purpose of the owner. The statute requires only that the

> property be transported in furtherance of a commercial enterprise. The transportation of defendant's repair equipment and spare parts across state lines to service its restaurants meets the statutory definition. Plaintiffs point to no authority that would lead to a different result, and this court can find none.

940 F.Supp. at 1261.

Kirkland alternatively argues that his job activities fall within a de minimis exception recognized by the Supreme Court in Pyramid Motor Freight Corp. v. Ispass, 330 U.S. 695 (1947). In that case, the Court held that although loaders of freight affect the safety of operation and thus fall within the MCA, persons who merely handle freight before or after loading perform tasks that may be too "trivial, casual or occasional" to affect safety and bring them within the MCA's authority. Id. at 708. It seems that Kirkland is contending that the de minimis exception applies to him because the great majority of his time was spent doing work at the project sites, not driving between them and Albertville. However, this argument must be rejected.

In Pyramid Motor Freight, the Supreme Court indicated that the continuing duties of an employee may be of such a quality that it can be said that, no matter how frequently or infrequently they are performed, they have only a slight or indirect impact on safety of motor vehicle operations, so as to render the employee outside the DOT's regulatory authority under the MCA. But what Kirkland is arguing necessarily raises a separate question, as one can hardly think of a task that more clearly implicates the very core of motor vehicle safety operation than an employee's driving. See 29 C.F.R. § 782.3; Crooker v. Sexton Motors, Inc., 469 F.2d 206, 210 (1st Cir. 1972); Sinclair, 447 F.Supp. at 10-11. What Kirkland argues, rather, is that the quantity of time he spent driving interstate was minimal when

compared to the amount of time he spent performing his primary duties at the construction sites.  However, an employee who is called upon or is likely to be called upon in the regular course of his duties to perform, either regularly or from time to time, safety-affecting activities is considered to come within the MCA exemption, regardless of the proportion of the employee's time or his activities which is actually devoted to safety-affecting work in a particular workweek.  29 C.F.R. § 782.2(b)(3).  In fact, even where an employee's continuing duties do not directly affect safety, if safety affecting duties are assigned to him in particular workweeks, then the exemption applies to him in those workweeks, but not in the workweeks where he continues to perform the non-safety affecting job.  Id.  Here, Kirkland indicated that during the months he was working at Rockmart he would regularly drive substantial distances between two or three states once or twice per week, transporting necessary equipment and supplies in the process.  That is enough, the Court holds, to render any de minimis exception inapplicable. Accordingly, the Court determines that the evidence establishes Kirkland meets the MCA exemption of § 13(b)(1) of the FLSA during the period that he was stationed primarily at the Rockmart project, between May and September 2000.  Summary judgment in Hough's favor is warranted on that part of Kirkland's FLSA overtime claim.

However, such does not necessarily imply that Kirkland was similarly exempt during the prior period from late November 1999 to April 2000, when he was working full-time on the Chattanooga project, as Hough would seem to argue. The regulations provide that where the same employee is shifted from one job to another periodically or on occasion, the application of the MCA exemption is

tested on a workweek-to-workweek basis, by examining whether the employee's bona fide duties while in a particular position are such that he is or is likely to be called upon in the ordinary course of his work to perform, either regularly or from time to time, activities that affect safety of operation. 29 C.F.R. § 782.2(b)(4). Similarly, where the bona fide job duties of a private carrier require an employee to engage in safety-affecting activities only sporadically or occasionally as the result of his work assignments at a particular time, the MCA exemption will apply only in the workweeks where he engages in such safety-affecting activities. Id.

The Court concludes that there is no evidence indicating that the MCA exemption applied to Kirkland until he was assigned to Rockmart. There is no hint that Kirkland's usual job duties at Albertville subjected him to the MCA exemption. Likewise, the evidence fails to show that, while regularly stationed in Chattanooga during the period in quesiton, Kirkland transported Hough property or performed safety-affecting work within the meaning of the MCA, as he claims that he stayed in his motorhome near the project site except for the first two weeks he was there when he commuted from his home each day. Therefore, the Court finds that Hough's motion for summary judgment is due to denied insofar as it is based upon the MCA exemption and relates to Kirkland's FLSA overtime claim for the workweeks he was stationed in Chattanooga.

### 2. The Executive Exemption

Next, Hough contends that Plaintiffs are not entitled to overtime pay because they both meet the executive exemption set forth in § 13(a)(1) of the Act. That section provides in pertinent part that the overtime compensation requirements of § 7 of the Act do not apply with respect to "any employee employed in a bona fide

executive . . . capacity." 29 U.S.C. § 213(a)(1).  Hough bears the burden of proving

the applicability of the exception, which is construed strictly against the employer.

Freeman v. City of Mobile, Ala., 146 F.3d 1292, 1297 (11th Cir. 1998).

The Department of Labor ("DOL") has promulgated regulations setting forth

both a "short test" and a "long test" to be used for determining whether an

employee meets the executive exemption.  See 29 C.F.R. § 541.1; Brock v.

Norman's Country Market., Inc., 835 F.2d 823, 825 (11th Cir. 1988) (defining "short

test" versus "long test").  Hough argues only that each Plaintiff meets the "short

test," pursuant to which an employee is deemed to be employed in an executive

capacity if four requirements are met: (1) he is compensated on a salary basis; (2) he

is compensated at a rate of not less than $250 per week[13]; (3) his primary duty

consists of management of the enterprise in which he is employed or of a

customarily recognized department or subdivision of it; and (4) he customarily and

regularly directs the work of two or more other employees.  29 C.F.R. §§ 541.1(f);

541.119(a); Prickett v. DeKalb County, 92 F.Supp. 2d 1357, 1369 (N.D. Ga. 2000);

Thomas v. Jones Restaurants, Inc., 64 F.Supp. 2d 1205, 1209 (M.D. Ala. 1999).

### KIRKLAND

As the Court has already determined that Kirkland meets the MCA

---

[13]The Court notes the considerable irony in the fact that the "short test" is labeled by the regulations as a "special proviso for high salaried executives." 29 C.F.R. § 541.119.  By eliminating several specific requirements of the "long test," the short test was conceived as a way to ease the burden upon employers to show that their highly paid employees worked in a bona fide executive capacity and were thus exempt from FLSA overtime requirements. However, due to the fact that the $250 weekly salary threshold set forth in the regulations, which equates to a yearly salary of $13,000, has not been raised since 1975, virtually every employee who is paid on a salary basis is subject to the short test. See Shaw v. Prentice Hall Computer Pub., Inc., 151 F.3d 640, 643 n.2 (7th Cir. 1998) (discussing the parallel "special proviso for high salaried administrative employees," 29 C.F.R. § 541.214).

exemption of § 13(b)(1) for the period that he worked at Rockmart, there is no need to address whether he also meets the executive exemption of § 13(a)(1) for the same period. Thus, the Court will confine its analysis of the executive exemption as it applies to Kirkland to the period that he was regularly stationed at Chattanooga, between about late November 1999 and April 2000. Hough argues that the evidence establishes that Kirkland was an exempt executive because he allegedly "supervised crews, worked without supervision and with complete discretion, and attended meetings reserved for supervisory personnel." Defendant's Brief at 19. The Court disagrees that the requirements of the executive exemption are met.

First, the record indicates that, whatever his duties were otherwise, Kirkland did not customarily and regularly direct the work of two or more employees during the period he was regularly stationed on the Chattanooga project. Indeed, the record shows that Kirkland did not supervise any employees at all during a substantial majority of the time he was there. Kirkland acknowledges that at times he supervised a crew of two or three hourly laborers, but he claims he did so only during about the last month of the approximately four he was on the project. Moreover, Kirkland testified that he directed the work of this crew only when there was a leak or a spill and he needed someone to clean up feed or other materials so that he could access the equipment and perform the technical work needed to fix the problem. This suggests that even during the period that Kirkland did supervise this crew, he did not do so "customarily and regularly," which is defined in the regulations in another context as signifying "a frequency which must be greater than occasional but which may be less than constant." 29 C.F.R. § 541.107(b). See also Gorman v. Continental Can Co., 1985 WL 5208, *6 (N.D. Ill. 1985). Finally,

Kirkland stated that this crew was normally under the direction of Wayne Franks, Kirkland's supervisor on the project at the time, and that he, Kirkland, would merely "grab" these employees on the particular occasions he needed them, tell them what to clean up, and then release them immediately upon the completion of their assigned task. Such evidence of inconsistent and shared supervision further indicates that Kirkland did not customarily and regularly direct their work. See 29 C.F.R. § 541.105(e) ("An employee who merely assists the manager . . . of a particular department and supervises two or more employees only in the actual manager's . . . absence does not meet" the requirement that supervision be customary and regular. Nor does "[a] shared responsibility for the supervision of the same two or more employees in the same department . . ."). The Court concludes that the evidence fails to establish that Kirkland meets the executive exemption during the period that he was regularly stationed in Chattanooga. Accordingly, Hough's motion for summary judgment on Kirkland's FLSA overtime claim is due to be denied as it relates to that period.

### BECK

Next, the Court turns to consider whether the evidence shows that Beck's duties on the CP project rendered him an exempt executive. In addition to the element discussed above that an exempt executive must have supervised two or more employees, it also must be shown that the executive's "primary duty" consisted of "management." 29 C.F.R. § 541.1(f); Joiner v. City of Macon, 647 F.Supp. 718, 721 (M.D. Ga. 1986). A determination of whether an employee has management as his primary duty must be based upon all the facts in a particular case. 29 C.F.R. § 541.103. The regulations provide that "in the ordinary case it

may be taken as a good rule of thumb" that "primary duty" means that more than 50% of an employee's time is spent performing managerial functions. Id. The regulations give the following examples of such functions:

> [i]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency of the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property.

29 C.F.R. § 541.102. However, time spent on such managerial tasks is not the sole test, as an employee who spends less than the majority of his time on managerial tasks may nonetheless be said to have management as his primary duty if other factors support such a conclusion. 29 C.F.R. § 541.103. Such factors include: (1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which the employee exercises discretionary powers, (3) his relative freedom from supervision, and (4) the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. Id.

Further, the regulations specify that the employees "management" must be of "a customarily recognized department or subdivision" of the employer's enterprise, a phrase that is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. 29 C.F.R. § 541.104(a). Thus, the employee

"must be more than merely a supervisor of two or more employees; nor is it sufficient that he merely participates in the management of the unit." Id. "He must," rather, "be in charge of and have as his primary duty the management of a recognized unit which has a continuing function." Id. The unit supervised may qualify despite the fact that it moves from place to place and there is not continuity of the same subordinate personnel. Id. at § 541.104(c). Thus, "[t]he projects on which an individual in charge of a certain type of construction work is employed may occur at different locations . . . [and] the mere fact that he moves his location would not invalidate his exemption if there are other factors which show that he is actually in charge of a recognized unit with a continuing function in the organization." Id. at § 541.104(d). Similarly, if an employee "is in charge of the unit which has the continuing responsibility," for example, "for making all installations for his employer, or all installations in a particular city or a designated portion of a city, he would be in charge of a department or subdivision despite that he draws his subordinates from a pool of available men." Id. at § 541.104(e). However, "[i]t cannot be said . . . that a supervisor drawn from a pool of supervisors who supervises employees assigned to him from a pool and who is assigned a job or a series of jobs from day to day or week to week has the status of an executive." 29 C.F.R. § 541.104(f).

Beck arrived on the CP project in December 1997, and he remained stationed there until about August 1998 and returned a couple of times in September 1998. It is undisputed that during the first week or so that he was there, he did not supervise two or more employees and that he worked almost entirely as a laborer, supervising at most only one employee. In fact, Beck and Bearden's testimony

would indicate that Beck performed substantial amounts of physical labor on the project.[14] The evidence does support that, at some point thereafter, Beck became a supervisor to a labor crew of several hourly employees. However, Beck's testimony suggests that his authority and the amount of time he spent on management duties with regard to this crew were relatively minimal. Beck claims that it was George who hired these employees. While Beck acknowledges that he shared some immediate supervisory authority over them, and kept up with the hours they worked, Beck indicates that he worked along side them doing the same tasks while George closely watched over them and wielded disciplinary authority. Although George's testimony is to the contrary, the Court cannot say as a matter of law that Beck's testimony could not be credited by a factfinder. The foregoing would reasonably indicate that Beck's primary duty was not management.

Further, the Court concludes that the evidence of Beck's supervision of these particular employees does not establish that he managed of any kind of customarily recognized department or subdivision within Hough. During the construction portion of the CP project, almost all of the work was being done by subcontractors, not Hough, and the evidence indicates that the additional Hough employees comprising the crew Beck supervised were merely temporary hires, and their role on the project is ill-defined at best, as George offered only that they were hired to do "[a]nything that was needed." It might be said that Beck was the "supervisor" of this crew. But the Court concludes that Beck's supervision of this group of three

---

[14]Beck's brief often cites Bearden's testimony in support of the idea that Beck was primarily a laborer on the CP project. However, it should be noted that Bearden's testimony on this point is of limited value insofar as he was only on the project for 17 days, and there is nothing to indicate that Bearden was aware of Beck's role on the CP project after Bearden left.

employees hired on a temporary basis from the local area in the middle of a single construction project and who do not appear to have had any specific title or purpose other than to do whatever labor was needed to facilitate the work being done by the subcontractors must be construed as a customarily recognized unit with a continuing function. Therefore, the Court finds that the evidence does not demonstrate that Beck was an exempt executive for purposes of § 13(a)(1) of the Act and its implementing regulations during the CP project.

Hough also argues that Beck qualifies as an exempt executive based upon his acknowledgment that he was "in charge" of the CP project when George was absent from the site beginning in about July 1998. However, even if it is assumed that the CP project is a customarily recognized department or subdivision of Hough for purposes of the regulations, see Sutton v. Engineered Systems, Inc., 598 F.2d 1134 (8th Cir. 1979), the Court concludes that it cannot be determined that the evidence shows without dispute that Beck's "primary duty" was the "management" thereof. As indicated previously, Beck suggests that his primary job responsibilities involved performing physical labor with the crew of local employees. Further, there seems to be little doubt that George was managing the project for Hough when he was present at the site, and Beck claims that George was there almost every day from the time that he arrived in December 1997 until June or July 1998. George suggests that he was regularly there only until May or June 1998, but either way, George would have been present and managing the CP project for the majority of the time Beck was there. Also, Beck's admission that he was "in charge" of the CP site for Hough when George was gone is tempered by several other pieces of testimony suggesting limitations on his authority. First, Beck contends that George

would be away from the project for only about one or two weeks at a time. Second, while Beck concedes that he would communicate the existence of problems and instructions between George and the subcontractors on a day-to-day basis, Beck denies that he actually oversaw the work of any of the subcontractors, as he claims that he was kept ignorant of their schedules and that all of their work was critiqued by George, not him. Finally, George's testimony indicates that most of the construction work on the CP project was complete by the time he was no longer there on a regular basis. See George Karamanolis depo. at 136. Soon after that time, in July and August 1998 according to Kirkland, numerous other Hough employees came down from the Albertville facility to install equipment. Beck alleges, however, that he did not have any authority over these Hough employees, some of whom were his supervisors at the plant, when they were on the project site. Based upon the foregoing, the Court concludes that a factfinder could reasonably determine that Beck's primary duty during the CP project was not management of a customarily recognized department or subdivision. Therefore, Hough has not demonstrated that the evidence is without dispute that Beck met the executive exemption during that period, between December 1997 and September 1998.

### 3. The Timeliness of Beck's Claim

Having determined that Hough has failed to establish that Beck was exempt from the overtime provisions of the FLSA, the Court turns to Hough's argument that any overtime claim Beck might have for work he did on the CP project is barred by the statute of limitations. 29 U.S.C. § 255(a) provides that an action under the FLSA "shall be forever barred unless commenced within two years after

the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." In McLaughlin v. Richland Shoe Co., 486 U.S. 128 (1988), the Supreme Court defined willful violations as those where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Id. at 133. Such implies that in order for a violation to be considered wilfull, it must have resulted from the employer's conduct that is more culpable than mere negligence. See Reich v. Department of Conservation and Natural Resources, State of Ala., 28 F.3d 1076, 1084 (11th Cir. 1994) (citing McLaughlin, 486 U.S. at 133).

Beck seeks overtime pay for the period that he spent working on the CP project, which was between December 1997 and September 1998. This action was filed on October 25, 2000. Thus, if the two year statute of limitations is applied, as Hough maintains should be done, Beck's FLSA overtime claim is completely barred. Beck responds, however, by asserting that the evidence is sufficient to indicate that Hough's failure to pay him overtime was a willful violation of the FLSA, which would implicate the three-year statute of limitations. The Court agrees. If the version of events alleged by George is credited, the two-year statute of limitations would apply to bar Beck's FLSA overtime claim, as he claims that he always believed that Beck was an exempt employee while on the CP project based upon his salaried supervisor status and that he, George, never made statements indicating a contrary belief. But on summary judgment, the Court must resolve all reasonable inferences in favor of the non-moving party. Beck alleges that George told him both during and after the CP project that he would be paid overtime for

that project.  The Court concludes that such evidence would allow a factfinder to determine that Hough's failure to pay Beck overtime was a willful violation, as it reasonably could suggest that George was aware that Beck had to be paid overtime under the FLSA for the work he did on the CP project.  Therefore, Hough's motion for summary judgment will be denied as it pertains to Beck's FLSA overtime claim.

## B. FLSA Retaliation Claims

Each Plaintiff also brings a claim that Hough violated the FLSA's anti-retaliation provision, § 15(a)(3) of the Act,[15] by allegedly terminating his employment because he complained that he was owed overtime.  A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: (1) he engaged in activity protected under the Act; (2) he subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.  Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-43 (11th Cir. 2000).  If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. Id. at 1343.  In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights.  Id. (citing Reich v. Davis, 50 F.3d 962, 965-66 (11th Cir. 1995)).

## KIRKLAND

Hough contends that it is entitled to summary judgment on Kirkland's FLSA

_____

[15]Section 15(a)(3) of the Act prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).

claim because, Hough argues, he did not suffer an adverse employment action. More specifically, Hough contends that the evidence shows that Kirkland voluntarily quit his employment. Kirkland does not dispute that the evidence establishes that he resigned. However, Kirkland maintains that he can show an adverse employment action in the form of a constructive discharge because, he asserts, he was forced to resign by Hough's failure to pay him for overtime and various expenses he incurred.

A constructive discharge would constitute an adverse employment action for purposes of an FLSA retaliation claim. See, e.g., Ford v. Alfaro, 785 F.2d 835, 841-42 (9th Cir. 1986) (ruling that plaintiffs were entitled, as a matter of law, to recover on FLSA retaliation claims founded upon constructive discharge). In order to prevail on a claim of constructive discharge in this circuit, a plaintiff " 'must demonstrate that [his] working conditions were so intolerable that a reasonable person in [his] position would be compelled to resign.' " Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999) (quoting Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993)). However, "[i]n the course of most, if not all, people's employment a wide variety of disappointments, and possibly some injustices, occur. Most of these are normal incidents of employment that would not lead a reasonable person to quit." Rutan v. Republican Party of Illinois, 868 F.2d 943, 950 (7th Cir. 1989), aff'd in part, rev'd in part on other grounds, 497 U.S. 62 (1990).

The evidence shows that Kirkland indicated to George that he, Kirkland, would not return to work until he received both overtime pay he believed he was owed from the Chattanooga and Rockmart projects as well as an expense reimbursement for the gas and diesel fuel he allegedly purchased for company use.

George tried to appease Kirkland by offering him an extra day's pay; Kirkland said that was not good enough, and he never returned to work. The Court concludes that these circumstances fall short of being sufficient to support a claim of constructive discharge. Compare <u>Bourque v. Powell Elec. Mfg. Co.</u>, 617 F.2d 61, 65-66 (5th Cir. 1980)[16] (unequal pay on the basis of sex and disappointment at failure to receive expected pay raise not sufficient to establish constructive discharge), and <u>Hutchins v. International Broth. of Teamsters</u>, 177 F.3d 1076, 1082 (8th Cir. 1999) (no constructive discharge for purposes of a retaliation claim under 29 U.S.C. § 215(a)(3) where the employee claims that she was forced to quit her job as a result of the employer's refusal to rectify pay disparities that allegedly violated the Equal Pay Act), with <u>Alfaro</u>, 785 F.2d at 842-43 (resignation caused by two weeks of sustained harassment that included multiple threats of physical violence based upon employee's FLSA complaints constituted constructive discharge as a matter of law). Because the evidence shows Kirkland's resignation did not amount to a constructive discharge, Hough's motion for summary judgment on Kirkland's FLSA retaliation claim is due to be granted.

**BECK**

Hough argues that it is also entitled to summary judgment on Beck's claim alleging that he was terminated in retaliation for having complained that he was owed overtime under the FLSA. For purposes of summary judgment, Hough appears willing to assume that the evidence is sufficient to indicate that Beck engaged in activity protected under the FLSA, based upon his complaints to his

---

[16]All decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit. <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

supervisors and Peter and George Karamanolis that he was owed overtime for the work he did on the CP project.[17]  However, emphasizing that Beck admits that he was never actually told he was "fired," Hough first takes the position that Beck, like Kirkland, quit his job and that a constructive discharge analysis pertains.  Unlike Kirkland, however, Beck does not admit that he resigned; he maintains that he was, in fact, fired.  The Court agrees that there is more than ample evidence supporting Beck's contention.

The Eleventh Circuit has explained that a determination of whether an employee has actually been terminated requires an analysis of the employer's intent, which may be inferred not only from words but also from conduct, as well as the specific circumstances of the challenged job action.  Thomas v. Dillard Dept. Stores, Inc., 116 F.3d 1432, 1437 (11th Cir. 1997).  For example, it may be inferred that a termination has occurred where the employer "by acts or words, shows a clear intention to dispose with the services of the employee."  Id. at 1434 (quoting Payne v. Crane Co., 560 F.2d 198, 199 (5th Cir. 1977)).  Accordingly, an employee may be found to have been involuntarily terminated notwithstanding that the employer never used the word "fired."  See E.E.O.C. v. White and Son Enterprises, 881 F.2d 1006, 1011 (11th Cir. 1989) (holding that the record supported that the plaintiffs had been discharged because "[e]ven though [their supervisor] never used the term 'fired' when addressing the [plaintiffs], they believed, drawing reasonable inferences from their employer's language and conduct, that they had no choice but to pick

---

[17]In this circuit, protected activity for purposes of an FLSA retaliation claim includes an employee's unofficial complaints to their employer regarding violations of the substantive provisions of the FLSA.  See E.E.O.C. v. White and Son Enterprises, 881 F.2d 1006, 1011-12 (11th Cir. 1989).

up their checks and leave"); <u>Thomas</u>, <u>supra</u>.

Beck alleges that he was fired thus: Peter came to him one day at the Albertville facility and requested that he transport two men and some equipment to the Chattanooga project site and that he should stay there until the job was completed. Beck replied that he would not do so, citing as the reason that he had still not been paid the overtime he was owed. At that point, Peter allegedly said that he felt like "they" had been good to Beck, that Beck was not going to get paid overtime for the CP project, and that if he "was not going to do them any more favors" then he, Peter, "didn't need [Beck's] employment any longer," and he asked Beck to turn in his keys to the Albertville facility. Beck Depo. at 82-83. This evidence is patently sufficient for a factfinder to infer that Beck was, in fact, involuntarily discharged. See <u>White</u>; <u>Thomas</u>, <u>supra</u>.

Next, Hough argues that Beck cannot establish a causal nexus between his complaints that he was owed overtime pay and the decision to terminate him, the third element of his prima facie case. More specifically, Hough argues that Beck's own testimony establishes that he had repeatedly refused requests by Peter and George Karamanolis to report for work assignments on various out-of-state construction projects, and that he was ultimately terminated after again telling Peter that he would not return to the field until he was paid the overtime he was owed. This evidence, Hough contends, demonstrates that if Beck was actually fired it was because he said he would not return to the field.

Although finding the question to be a close one, the Court finds that the evidence is sufficient to establish a causal link. Beck had urged repeatedly that he was owed overtime pay for the CP project. And there is no doubt that Peter was

aware of these complaints; indeed, he fired Beck just moments after Beck again raised the issue of overtime pay. And it should be noted that when Beck persisted about his claim for unpaid overtime Peter did not say that Beck was discharged because he would not go back into the field but because he would not do them any more "favors." The use of that term could suggest that making Beck go back out into the field was something that Peter did not believe he had an unqualified right to insist upon. That would undercut the assertion that Beck's declining to go into the field, which his prior experience indicated would involve substantial amounts of overtime work without additional pay, was the true reason for his termination. Based upon all of the evidence, the Court concludes that there is an issue of fact on this claim and that summary judgment is, therefore, due to be denied. See Wittenberg v. Wheels, Inc., 963 F.Supp. 654 (N.D. Ill. 1997) (denying summary judgment on a FLSA retaliation claim notwithstanding that the plaintiff admittedly had also refused to work extra hours).

### C. State-law Claims for Fraud

Plaintiffs claim that Hough is liable to them for fraud. The elements of fraud under Alabama law are: (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive. Padgett v. Hughes, 535 So.2d 140, 142 (Ala. 1988).

In their complaint, Plaintiffs allege that Hough agents made the following

representations, which form the basis of the fraud claims: (1) that Plaintiffs would be reimbursed for mileage and out-of-pocket expenses while traveling; (2) that they would be provided accommodations while traveling (3) that they would be paid overtime they worked; and (4) that Kirkland would be reimbursed for the use of his motorhome at a rate of $20 per day. Plaintiffs claim that they relied upon these misrepresentations and continued their employment, suffering economic loss and mental anguish.

However, as Hough points out, Plaintiffs acknowledge in their deposition that they are not now seeking to recover for mileage. Also, while Kirkland claims that he is due reimbursement for the use of his motorhome on the Chattanooga project, he admits that no Hough representative ever actually told him that he would receive such payment. Likewise, Beck admits that Hough paid for his accommodations on the CP project, and the Court concludes there is no evidence to support a fraud claim based upon Kirkland's accommodations in the field or upon Hough's failure to pay any out-of-pocket expenses, particularly given that these fraud claims are promissory in nature. Therefore, summary judgment will be granted as to Plaintiffs fraud claims regarding the above.

However, the Court notes that Plaintiffs have also alleged in their complaint that they were fraudulently induced to work on projects by false promises made by Hough agents with respect to overtime compensation. Hough does not address this allegation in their brief or reply in support of their motion for summary judgment. Therefore, the Court concludes that such fraud claims will remain viable at this point.

## D.  State-law Claims for Breach of Contract

In their complaint, Plaintiff allege that Hough is liable for breach of contract because it failed to reimburse Plaintiffs for mileage and other out-of-pocket expenses incurred during traveling. But, as stated above, Plaintiffs have acknowledged that they are not owed for mileage. Hough also seems to take the position that Plaintiffs' deposition testimony shows that they have similarly abandoned any claims for other expenses. However, the Court concludes that Kirkland's testimony shows that he continues to claim that he is owed a reimbursement for the money he spent for gas and diesel fuel in connection with transporting Hough property to the Chattanooga project site, shortly before he resigned. Hough fails to address this specific claim, and thus the Court will not grant summary judgment upon it.

The Court would note that Plaintiffs appear to claim in their brief that Hough is liable for breach of contract also based upon its failure to pay them overtime as promised. However, while Plaintiffs do cite Hough's failure to pay them overtime in connection with their fraud claims in Count III of their complaint, nowhere do Plaintiffs suggest in Count IV that their contract claims are based upon that same failure, notwithstanding that Plaintiffs do mention Hough's failure to pay them for mileage and travel expenses in both counts. Therefore, the Court concludes that there is not at this time in this case a contract claim based upon Hough's alleged failure to pay overtime.

## IV. CONCLUSION

Based upon the foregoing, the Court concludes that Hough's motion for summary judgment (Doc. 10) is due to be **GRANTED IN PART AND DENIED IN PART**. It is due to be **GRANTED** insofar as it pertains to (1) Kirkland's FLSA

overtime claim for the period that he was assigned to work on the Rockmart project; (2) Kirkland's claim for retaliatory discharge under the FLSA; (3) Plaintiffs' fraud claims pertaining to Hough's failure to pay for mileage, accommodations, other out-of-pocket travel expenses, and Kirkland's use of his motorhome on the Chattanooga project; and (4) Plaintiffs' breach of contract claims for mileage and other expenses, except for Kirkland's claim seeking reimbursement for gas and diesel fuel. Because the Court has concluded that there is no genuine issue of material fact and Hough is entitled to judgment as a matter of law on all of the above claims, they will be **DISMISSED** with prejudice. Hough's motion is otherwise **DENIED**. Following the resolution of this motion the following claims remain viable in this action:

(1) Beck's FLSA claim for overtime on the CP project;

(2) Kirkland's FLSA claim for overtime on the Chattanooga project;

(3) Beck's FLSA retaliatory discharge claim;

(4) Plaintiffs' fraud claims regarding the non-payment of overtime; and

(5) Kirkland's breach of contract claim for reimbursement on the gas and diesel fuel

**IT IS SO ORDERED**, this /16th day of August, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE